PEMBERTON & PENN FEDERAL, INC., et al.,

v.

The UNITED STATES.

CARNATION COMPANY et al.,

v.

The UNITED STATES.

Nos. 48487, 48488.

United States Court of Claims.
Oct. 2, 1956.

before the court have been selected by the parties as test cases, and our decision as to them will determine the disposition to be made of other similar claims.

The *S. S. Collingsworth*, which was owned by the United States Maritime Commission, was chartered in March 1940 to American Mail Line, Ltd., for a period of three years for operation between ports on the Pacific Ocean. On or about November 1, 1941, the vessel sailed from Seattle, Tacoma, and Vancouver carrying a cargo of general merchandise consigned to various persons in Shanghai, Hongkong, and points in the Philippine Islands. Because of the imminence of war between this country and Japan, and to prevent the capture or destruction of the vessel by the enemy, the master, Captain Stull, was ordered by the United States Navy to proceed to Honolulu for further orders from the Navy.

After the vessel sailed, Captain Stull received a succession of orders from various sources concerning what course he should pursue. He first received routing instructions from the United States Navy to proceed to Manila by way of Torres Strait and Molukk Passage. These routing instructions were subsequently changed so as to require him to proceed to Manila by way of Port Moresby in New Guinea, and Thursday Island, an Australian port. After arriving at Thursday Island on December 6, the vessel departed for Manila on the same day, but was forced to turn back on December 8 because of the chief engineer's illness. While returning to Thursday Island the vessel was ordered by the United States Navy to put in at the nearest friendly port, because of the outbreak of war.

After returning to Thursday Island on December 9, the *Collingsworth* received orders from either the United States Navy or the Australian Navy to proceed to Port Darwin, Australia, or to Java, as Captain Stull preferred. The vessel sailed on December 9 and arrived in Port Darwin on December 12, where she remained until December 22, awaiting Navy orders.

Martin P. Detels, New York City, for plaintiffs. Watters & Donovan, New York City, Abner H. Ferguson, Gordon L. Eakle, Washington, D. C., Charles W. Harvey, and Joseph J. Magrath, 3rd, New York City, were on the briefs.

Melford O. Cleveland, Wilton, Ala., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Kendall M. Barnes, Washington, D. C., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN anud LARAMORE, Judges.

WHITAKER, Judge.

These two cases involve certain cargo which was unloaded from the vessel *Collingsworth* in Batavia, Java, in 1942, and which plaintiffs allege was taken by the defendant for a public use.

A total of nine related petitions have been filed in which the plaintiffs claim they are entitled to just compensation for varying lots of cargo shipped on the *Collingsworth*. The two cases presently

In the meantime, American Mail Line was attempting to secure definite instructions from the United States Maritime Commission to unload the *Collingsworth* cargo, so as to free the vessel and also to afford itself protection against its bill of lading obligations. Either the American Mail Line itself, the master of the vessel, or the Maritime Commission requested permission to discharge her cargo at Port Darwin, but this permission was refused by the Australian authorities, because of a lack of warehouse facilities. Finally, on December 22, the Commission ordered American Mail Line to discharge the *Collingsworth* cargo at the nearest safe port of refuge offering protection to the interests of the cargo owners. The vessel was then to proceed to New Caledonia to load chrome ore, after which she was to return to the United States.

On December 22, 1941, the *Collingsworth* left Port Darwin for Oosthaven in the Netherlands East Indies, pursuant to instructions from the United States naval representative at Port Darwin, and arrived there on December 30. There were no cargo storage facilities at Oosthaven and the vessel left there on December 31 under advice from Dutch naval officials to proceed to Batavia in Java.

The vessel arrived at Batavia on January 1, 1942, and awaited permission to discharge her cargo. On January 9, pursuant to orders from the American Mail Line to Captain Stull, the *Collingsworth* commenced unloading her cargo into Godown (warehouse) H in Batavia, and by January 20 had discharged practically all of her cargo.

On January 22, 1942, the *Collingsworth* received instructions from the Dutch naval authorities to proceed to Singapore, where she was to take on tin and rubber for transport to the United States. After these instructions had been carried out, the vessel returned to Batavia, took on some rubber and tinplate at Sourabaya in Java, and returned to the United States, by way of Ceylon.

From the time the vessel left Singapore she proceeded under instructions received at different times from or through representatives of the Governments of the United States, Great Britain, and the Netherlands. From the time the vessel originally began her voyage on November 1, 1941, American Mail Line had no control over the ship's procedure.

There is no evidence that the defendant ever attempted to requisition the vessel's cargo. It appears that Captain Stull, the American Mail Line, and the United States Government all wanted the *Collingsworth* to be unloaded at Batavia, or any safe port in the area. The primary motive of the defendant in wanting the vessel unloaded was to obtain use of the vessel. The American Mail Line wanted the cargo unloaded in a safe port so as to terminate its liabilities under the bills of lading and to secure the safety of the ship and crew by permitting a departure to safer areas.

The American Mail Line addressed three successive sets of letters to all shippers of cargo on the *Collingsworth* after the outbreak of the war. The first set, dated variously from December 23 to December 29, stated that the *Collingsworth* had proceeded to Darwin because of military events, and that instructions had been received from United States Government authorities to discharge all cargo at Darwin or at some other place which, in the discretion of the master, was best designed to secure protection to the vessel and her cargo. This letter also stated that the discharge of cargo would be at the shipper's sole risk and expense.

The second letter, dated January 2, 1942, stated that the cargo was then in Batavia, and that all conditions set forth in the earlier letter still applied.

The third letter, dated January 13, 1942, stated that the cargo had been discharged at Batavia and placed in a first class warehouse in the shipper's name and at the shipper's risk.

After receipt of the third letter, some of the shippers requested the ship's agent in Batavia to deliver certain portions of the cargo to designated persons or firms in that region, and in most cases these requests were followed. The evidence does not reveal whether or not Pemberton & Penn Federal, Inc., one of the plaintiffs herein, made such a request with respect to its tobacco, or whether the tobacco in question was ever delivered to anyone from the warehouse in Batavia.

After it received the third letter, Carnation Company, the plaintiff in the second case before the court, entered into negotiations with the British Ministry of Food, for sale of its cargo of canned milk to the latter. Carnation obtained the necessary license to sell, and delivered a surety bond to American Mail Line to induce it to make delivery to the British Ministry of Food. On or about February 11, 1942, an agreement of sale was finally reached between Carnation and the British Ministry of Food. However, the evidence does not establish that delivery was ever made and Carnation was not paid since it was not able to prove delivery in Batavia.

On March 5, 1942, the Japanese invaded Batavia and the fate of the cargo in Godown H is not known, although unspecified parts of it had been delivered to local purchasers prior to Japanese entry.

Upon these stated facts, the plaintiffs say that the defendant took their property for a public use, and that they are entitled to recover just compensation for the taking. We find no merit in the plaintiffs' contention.

In the entire record we can find no evidence that the United States Government ever took or appropriated any part of the cargo of the *Collingsworth*. The evidence reveals that the defendant wanted the *Collingsworth* unloaded so that the empty ship could be reloaded with strategic materials which were badly needed in the United States. Indeed, the plaintiffs readily admit that the defendant had no use for the property in question and did not in fact use it, and that the defendant's objective was to secure the cargo carrying capacity of the *Collingsworth*.

Plaintiffs take the position that since the movement of the *Collingsworth* was directed, to a large extent, by the defendant from the time the vessel began its voyage, the defendant exercised sufficient control over the cargo to constitute a taking of it. We cannot agree.

Shortly before the outbreak of the war and during the war, the United States undoubtedly directed the movement of practically all vessels flying the American flag. This result was inevitable in view of the grave crisis then facing the nation. It was to the interest of all that every vessel be protected as much as possible under the circumstances, and the United States Navy attempted to route the vessels so as to provide maximum protection. We do not believe that it can be seriously contended that the mere routing of a vessel by the Navy is sufficient to establish a taking of the cargo of that vessel, especially when the defendant has no need for the cargo and no intention whatever to take it.

Plaintiffs intimate that the orders to discharge the cargo at Batavia were given by the defendant, and that the owners of the vessel were opposed to such action. However, the evidence reveals that Captain Stull received orders from the American Mail Line to unload the cargo at Batavia. The American Mail Line previously had sought and obtained instructions from the Maritime Commission to unload the cargo at the nearest safe port. From the evidence it seems apparent that Captain Stull, the American Mail Line, and the defendant all wanted to have the cargo unloaded as quickly as possible, and even if the defendant had been solely responsible for discharging the cargo at Batavia, we do not think this would have amounted to a taking of the cargo.

At the time the cargo was unloaded, Batavia was in friendly hands and it did not fall into enemy hands until March 1942. After the cargo was unloaded its owners were notified as to its where-

abouts and, at the request of some of them, the ship's agent in Batavia delivered certain items of the cargo to designated persons or firms in that region. The plaintiff Carnation Company entered into a contract to sell the cargo it owned. This evidence indicates almost conclusively that the owners of the cargo, and not the defendant, had control of the cargo after it was unloaded.

It is true that the cargo of the *Collingsworth* might not have been lost had the vessel not been ordered to Batavia. However, the routing of the *Collingsworth* to Batavia was one of the fortunes of war which affected many innocent parties. Plaintiffs are not entitled to recover since they have failed to establish that the defendant took their property for a public use. Their petitions are therefore dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.